# United States Court of Appeals
## For the First Circuit

No. 09-1149

ASTRID G. ESTRADA; WENDY M. ESTRADA; GUILFREDO E. MUÑOZ;
JOSÉ A. AQUINO; CRUZ F. RIVERA; CARLOS E. TAMUP; JOSÉ BURGOS;
ABELINO M. URIZAR; ISRAEL TEBALAN; ROLANDO NORIEGA;
BORIS CRUZ; ELSA HERNÁNDEZ VILAVICENCIO,

Plaintiffs, Appellants,

v.

STATE OF RHODE ISLAND, State Police Department;
STEVEN M. PARE, individually and in his official capacity as
Superintendent of the Rhode Island State Police;
C. THOMAS CHABOT, individually and in his official capacity
as a state trooper employed by the State of Rhode Island,

Defendants, Appellees,

JANE DOE, individually and in her official capacity
as a state trooper employed by the State of Rhode Island,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, and Howard, Circuit Judges.

V. Edward Formisano, with whom American Civil Liberties Union,
Rhode Island Affiliate, Sinapi, Formisano, & Co., Ltd., was on
brief for appellants.
John M. Moreira, Special Assistant Attorney General, with whom
Patrick C. Lynch, Attorney General, James R. Lee and Brenda D.

Baum, Assistants Attorney General, were on brief for appellees. Larry James, General Counsel, Christina Corl, Crabbe, Brown & James, LLP, Michael M. Hethmon, Garrett R. Roe, and Immigration Reform Law Institute, Inc., as amicus curiae The National Fraternal Order of Police.

---

February 4, 2010

---

**TORRUELLA**, **Circuit Judge**.  Plaintiff-Appellants Astrid G. Estrada, Wendy M. Estrada, Guilfredo E. Muñoz,[1] José A. Aquino, Cruz F. Rivera, Carlos E. Tamup, José Burgos, Abelino M. Urizar, Israel Tebalan, Rolando Noriega, Boris R. Cruz, and Elsa Hernández Vilavicencio were passengers in a van that was stopped for failing to signal when changing lanes.  They filed this civil action in the District Court of Rhode Island challenging the actions of Officer Thomas Chabot of the Rhode Island State Police during the stop, namely, that he inquired into their immigration status, contacted Immigration and Customs Enforcement ("ICE") and transported them to ICE in violation of their Fourth Amendment rights.  Plaintiff Tamup also challenges the two pat-down searches to his person performed by Officer Chabot.  For the reasons stated below, we affirm the district court on all counts.

## I. Background[2]

The events transpired in the early morning of July 11, 2006.  Plaintiff-Appellant Carlos E. Tamup ("Tamup") was driving a fifteen-passenger van heading south on Interstate 95 in Rhode

---

[1]  Although the briefs in this case refer to a "Guilfredo E. Muñoz," at deposition, Mr. Muñoz explained that his first surname is Camay and his second surname is Muñoz.

[2]  The facts are drawn from deposition testimony of all parties, as well as exhibits submitted to the district court in support of the motions for summary judgment.  Because this case comes to us after a grant of summary judgment, we present the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor.  Fennell v. First Step Designs, Ltd., 83 F.3d 526, 534 (1st Cir. 1996).

-3-

Island.  The remaining eleven Plaintiffs were passengers in that van and were on their way to work in Westerly, Rhode Island. Somewhere near exit 4 in the Town of Richmond, Tamup failed to activate his turn signal as he switched lanes in the two-lane stretch of road.  Rhode Island State Police Officer Thomas Chabot ("Officer Chabot") was stationed in a marked state police cruiser parked on the grassy median on Interstate 95.  Upon observing that the van had failed to signal its lane change, Officer Chabot engaged his overhead lights to stop the van.[3]

At Officer Chabot's request, Tamup produced his driver's license, vehicle registration, and proof of insurance.  Responding to Officer Chabot's question, Tamup stated that his wife owned the van and that he and the other passengers were driving to work polishing jewelry in Westerly, Rhode Island.  Walking over to the passenger's side of the van, Officer Chabot asked the front seat passenger, Plaintiff Guilfredo E. Camay Muñoz ("Camay"), for identification.   When Camay stated that he did not have identification on his person, Officer Chabot asked for his name and birth date.  Although there was an obvious language barrier, Camay was able to give his name and provide his birth date.

---

[3]  The validity of the stop is not contested in this appeal.

Officer Chabot opened the front passenger door[4] and counted the number of people inside, stating that there were fifteen persons.[5]  Using Tamup as a translator, Officer Chabot asked the rest of the passengers to produce identification.  Some of the passengers produced various forms of identification: a gym membership card, a non-driver's license identification issued by the Rhode Island Division of Motor Vehicles, and two identifications issued by the Guatemalan Consulate.  Continuing to use Tamup as a translator, Officer Chabot then asked the passengers if they could produce documentation establishing their U.S. citizenship.[6]  None of the passengers was able to produce such

---

[4]  A ball of some sort fell out of the van as Officer Chabot opened the door.  In the videotape of the stop, Officer Chabot is seen picking up the ball and asking: "Ehh, make a good player huh?"

[5]  There appears to be a question as to how many passengers were in the van.  In their brief, appellees assert that there were fourteen people in the van, but in the enhanced audio of the stop, Officer Chabot is heard saying there are fifteen people.  In their briefs, Appellants contend there were only twelve people in the van, the total number of persons who now appeal.  However, in his deposition, Tamup states that he was transporting fourteen passengers.  In any event, this is not a material fact.

[6]  Plaintiffs argue that there is a material dispute as to when Officer Chabot inquired about the immigration status of the passengers.  Plaintiffs note that Officer Chabot, Tamup, and at least one other Plaintiff testified in their deposition that Officer Chabot made such requests and inquiries prior to returning to his cruiser the first time and conducting the computer checks.  However, other Plaintiffs testified that Officer Chabot gathered Tamup's license, returned to his cruiser, and did not ask for the identifications until he returned.  Because this dispute is not material to our analysis, we present the facts as stated by both Officer Chabot and Plaintiff Tamup, who translated Chabot's requests to the passengers.

documentation. According to Officer Chabot's deposition testimony, he did not observe any unusual or suspicious activity from Tamup or the van's passengers at this or any other time.[7] Officer Chabot also testified, however, that he normally requested identification from passengers in vehicles he stopped, and that more than 99 percent of the passengers from whom he requests identification can supply it.

Officer Chabot then requested that Tamup step out of the van so that he could perform a pat-down search.[8] See Terry v. Ohio, 392 U.S. 1 (1968). The search did not yield anything, but during the course of the pat-down, Officer Chabot asked Tamup if he and the rest of the passengers had green cards or work papers, and specifically requested that Tamup give him his social security number and green card. Tamup stated that he only had his driver's

---

[7] Defendants cite to deposition testimony of Plaintiff that they were nervous during the encounter with Officer Chabot. All of the testimony cited, however, relates to the Plaintiffs' referring to their own state of mind. We have been unable to find any evidence in the deposition testimony of Officer Chabot that he observed or recognized any nervousness on the part of the passengers in the van.

[8] The justification given by Officer Chabot for this pat-down at his deposition was that:

> I had 14 people in the van. And then once Mr. Tamup is in
> the van and he comes out of the van, I have no idea what
> he might have brought with him from the van, whether it
> be a knife, whether it be a weapon of some sort, so for
> my safety I conducted a Terry pat.

license and that the other passengers did not have any other documentation.

Apparently, sometime before Officer Chabot returned to his vehicle to run Tamup's license, many or most of the Plaintiffs had essentially admitted being in the country illegally. While the deposition testimony is sometimes less than clear on what exactly Officer Chabot asked the passengers, and Officer Chabot himself never testified that he understood the passengers to have stated directly that they were in the country illegally, Plaintiffs Tamup and Estrada both testified in their depositions that they had admitted to Officer Chabot that they and the rest of the passengers were not in the country legally.[9]

---

[9] Tamup testified that he told Officer Chabot that no one in the van had a green card or work papers:

> Q: Did he [Officer Chabot] ask you whether anyone else in the van had a green card?
> A: Yes. He said that if they were going to work, they had to have their papers, that if they worked here, they have to have a green card.
> Q: Did you tell him that there was -- no one in the van had a green card or work papers?
> A: We told him we didn't have anything.

While it is unclear whether the above exchange indicates that Tamup told Officer Chabot they were not carrying their green cards currently, or that they simply did not have them, Estrada testified as follows:

> Q: You said that the trooper asked you all in the van whether you had permission or license to be in the country, and someone said no?
> A: No. When he asked, we all said no.
> Q: Everyone in the van said the word, no?
> A: No. Not everybody. Just with their faces.

After Tamup sat back in the driver's seat in the van, Officer Chabot returned to his cruiser and conducted a background check on Tamup. Tamup's license came back as valid and his criminal background check was negative. Officer Chabot then contacted Immigration and Customs Enforcement ("ICE") and reported that he had pulled over a passenger van transporting individuals whom he believed might be illegal immigrants. Officer Chabot had to wait approximately three minutes to receive a return call from the ICE Providence office with instructions.

After speaking with someone at the ICE Providence office, Officer Chabot returned to the van and conducted a second pat-down of Tamup. A second state trooper, Officer Heather Donahue, arrived at the scene and conferred with Officer Chabot. Officer Chabot then informed Tamup that Tamup would have to drive the passenger van with all the passengers to the ICE Providence office. Tamup testified at his deposition that Officer Chabot told him it was his responsibility to take everyone to immigration and that "if anybody tried to escape, they could lose their life." Plaintiffs contend they did not consent to the detainment or the travel to ICE.[10]

_____

Q: Okay. Some people in the van actually said the word, no?
A: I don't remember. I know that I was one of those who said no.
Q: So you said the word, no?
A: Yes.

[10] Officer Chabot testified at his deposition that the passengers voluntarily acquiesced to his request to drive to the ICE office in

-8-

Plaintiff Camay testified that he himself heard Officer Chabot say "You lock the van or somebody's going to die."[11]  Other Plaintiffs testified that they heard Tamup translate the threat.

State troopers escorted the passenger van being driven by Tamup to the ICE Providence office without significant incident.[12] All of the van's passengers were taken into custody upon arrival.

In January 2007, all the passengers filed a complaint in Rhode Island District Court.  The complaint alleged an illegal search and seizure in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution as well as Article I, § 6 of the Rhode Island Constitution; unlawful discrimination under 42 U.S.C. §§ 1981, 1983, Article I, § 2 of the Rhode Island Constitution, and R.I. Gen. Laws 31-21.2 (the Rhode Island Racial Profiling Prevention Act of 2004); and a state tort claim of negligence.

At the conclusion of discovery, defendants filed a motion for summary judgment defending both on qualified immunity grounds

Providence.  In his police report, Officer Chabot stated that he attempted to give Tamup directions to the ICE office, but was unable to do so due to the language barrier, at which point Officer Chabot agreed to escort the van to the ICE office.  Because of the procedural posture of this case, we take the facts in the light most favorable to the Plaintiffs.

[11]  Officer Chabot denies these allegations but because of the procedural posture of this case, we take them as true.

[12]  The officers requested that Tamup stop the vehicle at one point during the drive so they could verify that the doors were locked, but this is not an issue in this case.

-9-

and substantive grounds.  Plaintiffs also filed a motion for partial summary judgment.  The district court entered judgment in favor of defendants on all counts on December 30, 2008.  Plaintiffs timely appealed.[13]

## II. **Standard of Review**

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  On a summary judgment motion, "[a] genuine issue exists where a 'reasonable jury could resolve the point in favor of the nonmoving party.'"  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation marks omitted).

Where, as here, the parties have filed cross-motions for summary judgment, the court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004).  "It is not for the court on summary judgment to weigh the evidence 'but to determine whether there is a genuine issue for trial.'" Cont'l Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d

---

[13] Plaintiffs only appeal the issues that involve Officer Chabot.

370, 373 (1st Cir. 1991) (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)). Ruling on each party's motion, the court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Id.

### III. **Discussion**

In this appeal, Plaintiffs press four main issues. First, Plaintiffs argue that the district court erred in ruling that Officer Chabot did not violate their Fourth Amendment rights by inquiring about their immigration status and contacting ICE. Second, Plaintiffs argue that Officer Chabot did not have reasonable suspicion to transport the Plaintiffs to the ICE Providence office. Third, Plaintiff Tamup individually argues that the district court erred in ruling that Officer Chabot had reasonable suspicion to conduct the two Terry pat-down searches of Tamup. Finally, Plaintiffs contend that the district court erred in ruling that Officer Chabot did not violate the Rhode Island Racial Profiling Prevention Act of 2004 ("the Act").

In this case, the district court ruled that Officer Chabot had reasonable suspicion to suspect immigration violations, to transport the Plaintiffs to ICE, and to twice pat-down Tamup. The court thus did not reach the issue of qualified immunity. We choose to answer the question of qualified immunity first, which makes it unnecessary to determine whether Officer Chabot had

reasonable suspicion to take these actions.  See Nelson v. Kline, 242 F.3d 33 (1st Cir. 2001).

"The doctrine of qualified immunity protects government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 526 (1st Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted).  To determine whether a particular officer is entitled to qualified immunity, "[a] court must decide: (1) whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Maldonado v. Fontánes, 568 F.3d 263, 269 (1st Cir. 2009).[14]

This second step has two aspects: (1) "the clarity of the law at the time of the alleged civil rights violation" and (2) whether, on the facts of the case, "a reasonable defendant would have understood that his conduct violated the Plaintiffs' constitutional rights."  Id.; see also Anderson v. Creighton, 483

---

[14]  Our Circuit had previously articulated this two-part test as a three-part test that remained faithful to the substance of the test articulated by the Supreme Court.  See, e.g., Bergeron v. Cabral, 560 F.3d 1, 7 (1st Cir. 2009).  However, we recently adopted the "[Supreme Court's two-part  test and abandon[ed] our previous usage of a three-step analysis."  Maldonado, 568 F.3d at 269.

-12-

U.S. 635, 640 (1987) ("[To overcome qualified immunity, t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). After Pearson, we no longer have to take these two steps in "strict sequence." Bergeron, 560 F.3d at 7 (citing Pearson v. Callahan, 129 S. Ct. 808, 818 (2009)). Thus if a reasonable official would not have understood that his conduct violated Plaintiffs' constitutional rights, we must grant him qualified immunity. "[T]his prong of the inquiry, while requiring a legal determination, is highly fact specific." Nelson, 242 F.3d at 35 n.2 (quoting Swain v. Spinney, 117 F.3d 1, 9 (1st Cir. 1997)).

If an officer is found to be deserving of qualified immunity under federal law, he will also be granted qualified immunity for the same claim under Rhode Island law. See Hatch v. Town of Middletown, 311 F.3d 83, 89-90 (1st Cir. 2002) (holding that Rhode Island law recognizes a qualified immunity defense under state law analogous to the federal doctrine of qualified immunity).

Turning to the facts of this case, we take each issue presented by the Plaintiffs in turn.

**A. The Inquiry About Immigration Status and Contacting ICE**

Plaintiffs do not contest the validity of the traffic stop, nor do they argue that it was unlawful for Officer Chabot to request identification from all the passengers in the van, a

question our Circuit has not conclusively decided.[15]  Instead, Plaintiffs argue that Officer Chabot's inquiry into their immigration status and subsequent call to ICE prolonged the traffic stop, converting it into an unlawful seizure in violation of the Fourth Amendment.

We cannot say, however, that it was clear as a matter of law that Officer Chabot's brief line of questioning, nor the three minutes it took for him to receive a response from ICE, unreasonably prolonged the stop such that independent reasonable suspicion was necessary to support his inquiry into Plaintiffs' immigration status.  The traffic stop at issue took place a year after the Supreme Court's decision in Muehler v. Mena, 544 U.S. 93 (2005).  In that case, the Court held that a police officer does not need independent reasonable suspicion to question an individual about her immigration status during the execution of a search warrant, but that such inquiry constitutes "mere police questioning" so long as the detention was not prolonged by the questioning.  Id. at 101.[16]

---

[15]  Compare United States v. Chaney, 584 F.3d 20, 27 (1st Cir. 2009) (finding that officer's inquiries into car passenger's identity did not violate passenger's rights) with United States v. Henderson, 463 F.3d 27, 31 (1st Cir. 2006) (declining to decide whether an officer could demand a passenger's identification).

[16]  Plaintiffs contend that this case is distinguishable from Muehler because of the timing of Officer Chabot's questions.  They allege that Officer Chabot did not ask about Plaintiffs' immigration status until after he had checked the status of Tamup's license and conducted a criminal background check, as well as

-14-

Other courts have held that questioning that extends the length of detention "by only a brief time" does not "make the custody itself unreasonable." United States v. Childs, 277 F.3d 947, 949 (7th Cir. 2002) (en banc). See also United States v. Alcaraz-Arellano, 441 F.3d 1252, 1259 (10th Cir. 2006); United States v. Burton, 334 F.3d 514, 518-19 (6th Cir. 2003); United States v. Purcell, 236 F.3d 1274, 1280 (11th Cir. 2001). At the time of the traffic stop, our Circuit had not decided this question. Cf. United States v. Chhien, 266 F.3d 1, 9 (1st Cir. 2009) (finding that officer's questions to the driver about his itinerary did not exceed the scope of the stop). In a more recent case, we rejected a defendant's argument that "police must limit a traffic citation stop to the narrow purpose of immediately preparing and issuing a citation." United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009) (finding that a delay of twelve minutes while officer prepared a traffic warning and questioned car's passenger about her itinerary did not unreasonably delay the stop).

We also note that by the time Officer Chabot asked about Plaintiffs' immigration status, he knew that: (1) Plaintiffs were

contacted ICE. When Officer Chabot contacted ICE, Plaintiffs argue, the purpose of the traffic stop was complete and the further questioning about immigration status unlawfully prolonged the stop. We note that by a number of witness accounts, including those of Tamup and Officer Chabot, Officer Chabot asked about Plaintiff's immigration status before running Tamup's license. But even if Officer Chabot did not pose the question until after returning Tamup's license, it was not clearly established law that the brief exchange unreasonably prolonged the traffic stop.

-15-

headed to work; (2) most were unable to produce any identification, and of the four who did, two could produce only identifications issued by the Guatemalan consulate; and (3) they spoke little English. Officer Chabot also testified that passengers, of whom he requests documentation as a matter of routine, are able to produce valid identification more than 99 percent of the time. All of these facts combined may well have sufficiently heightened his suspicions for him to believe that he could shift his inquiry from the traffic stop to investigating other potential criminal activity. See Chhien, 266 F.3d at 6 ("[W]hile an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.").

In any event, the law was not and is not know clearly established, such that Chabot should have known that he could not investigate further. We thus conclude that Officer Chabot is entitled to federal and state qualified immunity for any possible constitutional violations that he may have committed in asking the van's passengers questions about their immigration status and in contacting ICE.

## B. Escorting Plaintiffs to ICE

After contacting ICE, Officer Chabot returned to the van and demanded that Tamup follow him to the ICE office in Providence.

-16-

Plaintiffs contend that this prolonged the traffic stop and that Officer Chabot did not possess either reasonable suspicion or probable cause to detain and transport the Plaintiffs to ICE. On the other hand, defendant contends that the admission of undocumented status and the manner in which the events unfolded provided Officer Chabot with probable cause to believe Plaintiffs were violating immigration laws. See 8 U.S.C. § 1324 (harboring aliens); 8 U.S.C. § 1325 (improper entry by alien); 8 U.S.C. § 1304(e) (personal possession of registration or receipt card).

Plaintiffs make much of the difference in testimony between Officer Chabot's characterization of the escort as voluntary and the testimony on the record from multiple Plaintiffs that Officer Chabot issued a bodily threat against Tamup and/or the Plaintiffs if they did not follow his vehicle to the ICE Providence office. Because we find that Officer Chabot's actions fall under the doctrine of qualified immunity, this contested issue is not material.[17]

Probable cause exists when the circumstances, "viewed from the vantage point of a prudent, reasonable, cautious police officer . . . guided by . . . experience and training" are sufficient to warrant a reasonable person to believe that the individual had committed or was committing a crime. United States

---

[17] We are by no means condoning the type of threat alleged to have been made here -- one that for purposes of summary judgment, we take as true.

v. <u>Davis</u>, 458 F.2d 819, 821 (D.C. Cir. 1972); <u>United States</u> v. <u>Reyes</u>, 225 F.3d 71, 75 (1st Cir. 2000). The Supreme Court has made it clear that officers can "draw reasonable inferences from [the] facts in light of their knowledge of the area and their prior experience . . . ." <u>United States</u> v. <u>Ortiz</u>, 422 U.S. 891, 897 (1975).

Although Officer Chabot's police report and deposition testimony calls into question whether he himself believed he had probable cause to escort the Plaintiffs to ICE, "the Supreme Court has held that an officer's subjective belief is not dispositive of whether probable cause existed." <u>United States</u> v. <u>Pardue</u>, 385 F.3d 101, 106 n.2 (1st Cir. 2004); <u>Florida</u> v. <u>Royer</u>, 460 U.S. 491, 507 (1983) ("[T]he fact that the officers did not believe there was probable cause and proceeded on a consensual or <u>Terry</u>-stop rationale would not foreclose the State from justifying . . . custody by proving probable cause."). Rather, for the purposes of qualified immunity, we look to the objective perspective of a reasonable officer and inquire whether given all the facts in the record, that officer would have believed that he was not violating the Plaintiffs' Constitutional rights in taking the action at issue.

By the time that Officer Chabot demanded that Plaintiffs follow him to the ICE Providence office, two Plaintiffs had

essentially admitted on their behalf and on the behalf of the rest of the passengers, that they were in the country illegally.

Given the undisputed facts as we find them in the record and the state of the law, we are compelled to find that a reasonable defendant in Officer Chabot's position would have believed he had sufficient evidence giving rise to probable cause to support the conclusion that the van's occupants had committed immigration violations. Officer Chabot is thus entitled to qualified immunity for alleged violations of state or federal laws surrounding the seizure of Plaintiffs and their subsequent escort to the Providence ICE office.

## C. Pat-down Searches of Plaintiff Tamup

Plaintiff Tamup challenges the district court's ruling that Officer Chabot had reasonable suspicion to conduct the two pat-down searches of his person.[18] Tamup argues that Officer Chabot had neither a subjective nor an objective suspicion that Tamup was armed and dangerous.

The inquiry of whether an officer has reasonable suspicion to conduct a pat-down search requires a consideration of "the totality of the circumstances to see whether the officer had

---

[18] At the district court, all Plaintiffs sought to challenge Tamup's pat downs. The district court correctly ruled that only Tamup had standing to challenge the pat-downs, and Plaintiffs do not challenge this ruling. See United States v. Sowers, 136 F.3d 24, 28-29 (1st Cir. 1998) (holding that appellant who was not himself subjected to a pat down search did not have standing to raise a Fourth Amendment claim on the basis of said search).

-19-

a particularized, objective basis for his or her suspicion." United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005) (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). The Supreme Court has recognized that "[t]he risk of harm to both the police and the occupants [of a stopped vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation." Maryland v. Wilson, 519 U.S. 408, 414 (1997). "[D]anger to an officer during a traffic stop is [also] likely to be greater when there are passengers in addition to the driver in the stopped car." Id. at 415; see also United States v. Cruz, 156 F.3d 22, 26 (1st Cir. 1998) (finding that during a Terry stop, the number of suspects compared to the number of officers is a relevant factor in assessing an officer's safety concerns). This Court has consistently held that, while engaging in legitimate investigative conduct, "the police may take reasonable steps to protect themselves by searching a suspect for weapons or taking other protective measures." United States v. Taylor, 162 F.3d, 12, 17 (1st Cir. 1998); see also Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004). "Furthermore, the Court has recognized that traffic stops are 'especially fraught with danger to police officers.'" Arizona v. Johnson, 129 S. Ct. 781 (2009).

As to the first pat-down search, Tamup argues that Officer Chabot's reasons evince that he lacked subjective suspicion that Tamup was armed and dangerous. Tamup also argues that a

reasonable officer presented with the same circumstances would not have believed that his welfare was in jeopardy because Chabot did not point to having observed Tamup making any remarkable, sudden, or threatening movements while he was seated in the van.

Tamup makes similar arguments with regards to the second pat down, which occurred when Officer Chabot returned to the van after calling ICE and verifying that Tamup's paperwork was in order. Tamup points to Officer Chabot's articulation of the reason why he conducted the second pat down: that Officer Chabot believed that Tamup "could have picked up a weapon while he got back in his vehicle." Tamup argues that this does not amount to an articulable suspicion that Tamup was armed and dangerous. According to Tamup, if Officer Chabot had a concern that Tamup could access a weapon inside the van, he should have searched the van, the van's compartment, and the other passengers prior to permitting Tamup to return to the vehicle, or alternatively separated Tamup from the van and the passengers by placing him in the back of his police cruiser. Further, Tamup argues that no reasonable officer in Officer Chabot's position would have believed his safety was in danger, and conducted the second pat down under the circumstances, because there were no sudden or furtive movements, this was not a high crime area, it was not late at night, and there were no suspicious circumstances or criminal activity, or bulge in his clothing that would suggest that he was carrying a weapon.

-21-

Defendants argue that Officer Chabot's inability to obtain identifying information from most of the van passengers contributed to his reasonable belief that his interactions with Tamup could be dangerous. Defendants argue that due to the lack of identification presented, Officer Chabot could not conduct criminal background checks to dispel any safety concerns he had about the passengers. Defendants also add that the number of occupants in the van was also a significant factor in Officer Chabot's safety concerns. See Cruz, 156 F.3d at 26 (holding that officer's frisk was justified in part because of the number of occupants in the vehicle, "who outnumbered the police officer five to one"). With regards to the second pat down, defendants contend that it was even more reasonable for Officer Chabot to have concerns for his safety because he could not see Tamup while conducting the check and the situation had escalated since Plaintiffs had admitted to not having documentation of their legal status in the United States. Defendants argue that all these circumstances justified a second pat down.

Given the state of the law and the facts in this case, we cannot say that a reasonable officer, confronted with a similar situation as Officer Chabot, would have believed he was violating the Plaintiff's constitutional rights by conducting the two pat down searches. Before the first pat down, Officer Chabot was confronted with a fifteen-passenger van full of individuals who

were by their own admission heading to work, most of whom did not speak English, and who mostly lacked any identification. Two of the pieces of identification that were provided were issued by the Consulate of Guatemala. None of the passengers was able to provide proof of U.S. citizenship, and after Officer Chabot asked for such identification, he alerted the passengers to his belief that they were not in the country legally. The likely consequence of discovery of unauthorized entry or unauthorized stay in this country -- forced deportation -- is a serious matter with harsh consequences. Under these circumstances, it was not unreasonable for Officer Chabot to conclude that he was entitled to pat down Tamup to assert control over the situation and for his safety.

The second pat down occurred after Officer Chabot had conferred with ICE and had received confirmation that his suspicions as to the passengers were likely correct, as well as after some of the passengers had admitted to lacking proof of legal status. During this period of time, Officer Chabot lost visual contact with Tamup and the passengers. Although Officer Chabot did not testify that he himself observed nervousness on the part of the passengers, most of the passengers themselves testified that they had been nervous throughout the whole encounter.

It was not unreasonable for Officer Chabot to proceed as he did. Tamup's suggestion that Officer Chabot should have instead searched the van, its compartments, and all of the passengers

before allowing Tamup to return to the vehicle would have involved a greater intrusion and unquestionably increased risk. The suggestion that having all the passengers exit the van to allow Officer Chabot to inspect each of them in turn, requires little comment or analysis. The further suggestion that Officer Chabot should have separated Tamup from the van by placing him in his police cruiser was a plausible alternative, but it was not unreasonable for Officer Chabot to decline to do so.

In the totality of the circumstances, we cannot say that a reasonable officer in Officer Chabot's position would have understood that his conduct violated Tamup's constitutional right. We thus hold that Officer Chabot is entitled to qualified immunity for both pat down searches under federal and state law.

**D. Rhode Island Racial Profiling Prevention Act**

Plaintiffs also brought a state law claim of prohibited racial profiling under the Act. In prohibiting racial profiling, the Act states that "[u]nless there exists reasonable suspicion or probable cause of criminal activity, no motor vehicle stopped for a traffic violation shall be detained beyond the time needed to address the violation." R.I. Gen. Laws § 31-21.2-5. A private cause of action for damages and equitable relief is statutorily provided for victims of racial profiling. R.I. Gen. Laws § 31-21.2-4.

The Act does not define "reasonable suspicion," nor has the term been construed under the statute. However, we agree with the district court that the Rhode Island legislature intended the term to have the same meaning as the standard developed under the Rhode Island Constitution. State v. Foster, 842 A.2d 1047, 1051 (R.I. 2004) (holding that "reasonable suspicion" is the same for purposes of the Rhode Island Constitution and the United States Constitution, that is, that it must be "based upon all of the circumstances") (quoting United States v. Cortéz, 449 U.S. 411, 417 (1981)).

Because we find that Officer Chabot could reasonably have believed that he had sufficient facts to warrant first reasonable suspicion, and later, probable cause of immigration violations, we find that he is entitled to qualified immunity for all of the challenged actions with respect to the Act.

For the reasons stated, the judgment is **affirmed**.

**"Concurring opinion follows"**

**LYNCH**, **Chief Judge**, **concurring**. I join in Judge Torruella's well-done opinion. As he states, this case raises no issue as to whether police officers may ask for the identification of all other passengers in a vehicle that is stopped for a minor traffic violation (failing to signal before changing lanes) by the driver. Cf. United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007). Nor does this case involve whether a police officer may detain and escort to the immigration authorities a vehicle containing persons who do not speak English and appear to be foreign, based on no more than the officer's "hunch" that the passengers may be aliens who entered or remained in the country illegally.

Rather, on the facts of this case, plaintiffs' claims must fail because a reasonable officer would have had no basis in existing law to conclude that his actions violated any constitutional rights, and so Officer Chabot is entitled to immunity. Maldonado v. Fontánes, 568 F.3d 263, 268-69 (1st Cir. 2009). The initial stop of the van and the two pat downs were plainly reasonable for safety reasons and provide no basis for any claim of constitutional violation.

In my view, the specific facts of this case also require the conclusion that the officer is entitled to immunity on all claims related to the detention and escorting of the vehicle and its passengers to the immigration authorities. Officer Chabot had

-26-

more information at his disposal than merely the Hispanic appearance of the passengers and their inability to speak English. He knew from the driver that all plaintiffs were on their way to work. He also knew that when asked for some form of identification, most plaintiffs produced none, two offered Guatemalan consular identification cards,[19] and one a Sports Fitness club I.D. card with no birth date on it. None of the passengers produced proof of United States citizenship when asked, nor did anyone produce a green card.

This information raised the real prospect that there were violations of criminal law by the driver, 8 U.S.C. § 1324(a)(1)(A)(ii), possibly by the employer, id. § 1324(a)(3)(A), and by the van's passengers, id. §§ 1304(e), 1306(a). Employers are required to review documents from the individuals they employ. Id. § 1324a(b)(1)(A)-(D). These materials include both employment authorization and identity documentation, id., such as a resident alien card or an alien registration card, id. § 1324a(b)(1)(B)(ii). Accordingly, if the passengers were employed as they said, they likely would have had, at a minimum, some form of identity documents. If they were not American citizens, a reasonable officer had grounds to believe they were violating the requirement

---

[19] Consular identification cards are issued by several foreign governments, including Guatemala's, and identify their bearers as citizens of the issuing country. See, e.g., H.R. Rep. 108-804, at 97-98 (2005).

to carry their registration, id. § 1304(e), or lacked registration because they had entered illegally, id. § 1306(a).  Either situation was a violation of law.

Thus, there was a reasonable basis[20] for the officer to contact Immigration and Customs Enforcement (ICE).  The ICE representative called back three minutes later and noted that the agency wanted to identify the passengers and their status, "due to the lack of identification and strong possibility that the [van's] occupants were illegal immigrants."

This was enough to raise a serious question, warranting further investigation of whether plaintiffs were in violation of immigration laws.  A reasonable officer would believe this evidence was sufficient to merit extending the period of detention for the next one-to-two hours to accompany the van to the ICE office, whether the passengers consented or not.  Indeed, federal law gives the authority to arrest for violations of § 1324 to all "officers whose duty it is to enforce criminal laws."  Id. § 1324(c).

Plaintiffs' claims were properly dismissed.

---

[20]  The majority opinion's reliance on plaintiffs' own admissions that they told Officer Chabot they were illegal aliens is proper, but I do not rely on it because Officer Chabot did not testify they said so and because the admission is not contained in the police report.