Justice Alito,
concurring in part and dissenting in part.
This case concerns four provisions of Arizona’s Support Our Law Enforcement and Safe Neighborhoods Act, S. B. 1070. Section 2(B) requires Arizona law enforcement officers to make a “reasonable attempt,” “when practicable,” to ascertain the immigration status of any person who an officer lawfully stops, detains, or arrests “where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States.” Ariz. Rev. Stat. Ann. §11-1051(B) (West 2012). Section 3 provides that an alien who willfully fails “to complete or carry an alien registration document” in violation of 8 U. S. C. § 1304(e) or § 1306(a) is guilty of a misdemeanor. Ariz. Rev. Stat. Ann. § 13-1509(A) (West Supp. 2011). Section 5(C) makes it a misdemeanor for an unauthorized alien who is unlawfully present in the United States “to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor.” Ariz. Rev. Stat. Ann. §13-2928(C). And §6 au *441 thorizes Arizona law enforcement officers to arrest without a warrant any person who an officer has probable cause to believe “has committed any public offense that makes the person removable from the United States.” Ariz. Rev. Stat. Ann. § 13-3883(A)(5).
I agree with the Court that § 2(B) is not pre-empted. That provision does not authorize or require Arizona law enforcement officers to do anything they are not already allowed to do under existing federal law. The United States’ argument that § 2(B) is pre-empted, not by any federal statute or regulation, but simply by the Executive’s current enforcement policy is an astounding assertion of federal executive power that the Court rightly rejects.
I also agree with the Court that § 3 is pre-empted by virtue of our decision in Hines v. Davidowitz, 312 U. S. 52 (1941). Our conclusion in that ease that Congress had enacted an “all-embracing system” of alien registration and that States cannot “enforce additional or auxiliary regulations,” id., at 66-67, 74, forecloses Arizona’s attempt here to impose additional, state-law penalties for violations of the federal registration scheme.
While I agree with the Court on §§2(B) and 3,1 part ways on § § 5(C) and 6. The Court’s holding on §5(C) is inconsistent with De Canas v. Bica, 424 U. S. 351 (1976), which held that employment regulation, even of aliens unlawfully present in the country, is an area of traditional state concern. Because state police powers are implicated here, our precedents require us to presume that federal law does not displace state law unless Congress’ intent to do so is clear and manifest. I do not believe Congress has spoken with the requisite clarity to justify invalidation of §5(C). Nor do I believe that §6 is invalid. Like §2(B), §6 adds virtually nothing to the authority that Arizona law enforcement officers already exercise. And whatever little authority they have gained is consistent with federal law.

*442
Section 2(B)

A
Although §2(B) of the Arizona law has occasioned much controversy, it adds nothing to the authority that Arizona law enforcement officers, like officers in all other States, already possess under federal law. For that reason, I agree with the Court that § 2(B) is not pre-empted.
Section 2(B) quite clearly does not expand the authority of Arizona officers to make stops or arrests. It is triggered only when a “lawful stop, detention or arrest [is] made . . . in the enforcement of any other [state or local] law or ordinance .” Ariz. Rev. Stat. Ann. §11-1051(B) (emphasis added). Section 2(B) thus comes into play only when an officer has reasonable suspicion or probable cause to believe that a person has committed a nonimmigration offense. Arizona officers plainly possessed this authority before §2(B) took effect.
Section 2(B) also does not expand the authority of Arizona officers to inquire about the immigration status of persons who are lawfully detained. When a person is stopped or arrested and “reasonable suspicion exists that the person is an alien and is unlawfully present in the United States,” §2(B) instructs Arizona officers to make a “reasonable attempt,” “when practicable,” to ascertain that person’s immigration status. Ariz. Rev. Stat. Ann. § 11-1051(B). Even before the Arizona Legislature enacted §2(B), federal law permitted state and local officers to make such inquiries. In 8 U. S. C. § 1357(g)(10)(A), Congress has made clear that state and local governments need not enter into formal agreements with the Federal Government in order “to communicate with the [Federal Government] regarding the immigration status of any individual.” In addition, Congress has mandated that neither the Federal Government nor any state or local government may “prohibit, or in any way restrict, any government entity or official from sending *443 to, or receiving from, [the Federal Government] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.” § 1373(a); see also §1644 (providing that “no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [the Federal Government] information regarding the immigration status, lawful or unlawful, of an alien in the United States”). And while these provisions preserve the authority of state and local officers to seek immigration-status information from the Federal Government, another federal statute, § 1373(c), requires that the Federal Government respond to any such inquiries “by providing the requested verification or status information.” It comes as no surprise, therefore, that many States and localities permit their law enforcement officers to make the kinds of inquiries that §2(B) prescribes. See App. 294-298 (reporting that officers in 59 surveyed state and local jurisdictions “generally” ask arrestees about their immigration status while 34 do not and that officers in 78 jurisdictions “generally” inform Immigration and Customs Enforcement (ICE) when they believe an arrestee to be an undocumented alien while only 17 do not). Congress has invited state and local governments to make immigration-related inquiries and has even obligated the Federal Government to respond. Through §2(B), Arizona has taken Congress up on that invitation.
The United States does not deny that officers may, at their own discretion, inquire about the immigration status of persons whom they lawfully detain. Instead, the United States argues that § 2(B) is pre-empted because it impedes federal-state cooperation by mandating that officers verify the immigration status of every detained person if there is reason to believe that the person is unlawfully present in the country. The United States claims that §2(B)’s mandate runs contrary to federal law in that it “precludes officers from taking [the Federal Government’s] priorities and discretion *444 into account.” Brief for United States 50. “[B]y interposing a mandatory state law between state and local officers and their federal counterparts,” writes the United States, §2(B) “stands as an obstacle to the accomplishment of the federal requirement of cooperation and the full effectuation of the enforcement judgment and discretion Congress has vested in the Executive Branch.” Ibid, (internal quotation marks and citation omitted).
The underlying premise of the United States’ argument seems to be that state and local officers, when left to their own devices, generally take federal enforcement priorities into account. But there is no reason to think that this premise is true. And even if it were, it would not follow that § 2(B)’s blanket mandate is at odds with federal law. Nothing in the relevant federal statutes requires state and local officers to consider the Federal Government’s priorities before requesting verification of a person’s immigration status. Neither 8 U. S. C. § 1357(g)(10) nor § 1373(a) conditions the right of state and local officers to communicate with the Federal Government on their first taking account of its priorities. Nor does § 1373(c) condition the Federal Government’s obligation to answer requests for information on the sensitivity of state and local officers to its enforcement discretion. In fact, § 1373(c) dictates that the Federal Government “shall respond” to any inquiry seeking verification of immigration status, and that command applies whether or not the requesting officer has bothered to consider federal priorities. Because no federal statute requires such consideration, § 2(B) does not conflict with federal law.
In any event, it is hard to see how state and local officers could proceed in conformity with the Federal Government’s enforcement priorities without making an inquiry into a suspected alien’s immigration status. For example, one of the Federal Government’s highest priorities is the apprehension and removal of aliens who have failed to comply with a final order of removal. See App. 108. How can an officer iden *445 tify those persons without first inquiring about their status? At bottom, the discretion that ultimately matters is not whether to verify a person’s immigration status but whether to act once the person’s status is known. For that reason, §2(B)’s verification requirement is not contrary to federal law because the Federal Government retains the discretion that matters most—that is, the discretion to enforce the law in particular cases. If an Arizona officer contacts the Federal Government to verify a person’s immigration status and federal records reveal that the person is in the country unlawfully, the Federal Government decides, presumably based on its enforcement priorities, whether to have the person released or transferred to federal custody. Enforcement discretion thus lies with the Federal Government, not with Arizona. Nothing in § 2(B) suggests otherwise.
The United States’ attack on § 2(B) is quite remarkable. The United States suggests that a state law may be preempted, not because it conflicts with a federal statute or regulation, but because it is inconsistent with a federal agency’s current enforcement priorities. Those priorities, however, are not law. They are nothing more than agency policy. I am aware of no decision of this Court recognizing that mere policy can have pre-emptive force. Cf. Barclays Bank PLC v. Franchise Tax Bd. of Cal., 512 U. S. 298, 380 (1994) (holding that “Executive Branch communications that express federal policy but lack the force of law cannot render unconstitutional” an “otherwise valid, congressionally condoned” state law). If § 2(B) were pre-empted at the present time because it is out of sync with the Federal Government’s current priorities, would it be unpre-empted at some time in the future if the agency’s priorities changed?
Like most law enforcement agencies, ICE does not set out inflexible rules for its officers to follow. To the contrary, it provides a list of factors to guide its officers’ enforcement discretion on a case-by-case basis. See Memorandum from John Morton, Director, ICE, to All Field Office Directors *446 et al., Exercising Prosecutorial Discretion Consistent With the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens 4 (June 17, 2011) (“This list is not exhaustive and no one factor is determinative. ICE officers, agents, and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE’s enforcement priorities”). Among those factors is “the agency’s civil immigration enforcement priorities,” ibid., which change from administration to administration. If accepted, the United States’ pre-emption argument would give the Executive unprecedented power to invalidate state laws that do not meet with its approval, even if the state laws are otherwise consistent with federal statutes and duly promulgated regulations. This argument, to say the least, is fundamentally at odds with our federal system.
B
It has been suggested that § 2(B) will cause some persons who are lawfully stopped to be detained in violation of their constitutional rights while a prolonged investigation of their immigration status is undertaken. But nothing on the face of the law suggests that it will be enforced in a way that violates the Fourth Amendment or any other provision of the Constitution. The law instructs officers to make a “reasonable attempt” to investigate immigration status, and this language is best understood as incorporating the Fourth Amendment’s standard of reasonableness. Indeed, the Arizona Legislature has directed that §2(B) “shall be implemented in a manner consistent with federal laws . . . protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens.” Ariz. Rev. Stat. Ann. § 11-1051(L).
In the situations that seem most likely to occur, enforcement of § 2(B) will present familiar Fourth Amendment ques *447 tions. To take a common situation, suppose that a car is stopped for speeding, a nonimmigration offense. (Recall that §2(B) comes into play only where a stop or arrest is made for a nonimmigration offense.) Suppose also that the officer who makes the stop subsequently acquires reasonable suspicion to believe that the driver entered the country illegally, which is a federal crime. See 8 U. S. C. § 1325(a).
It is well established that state and local officers generally have authority to make stops and arrests for violations of federal criminal laws. See, e. g., Miller v. United States, 357 U. S. 301, 305 (1958); United States v. Di Re, 332 U. S. 581, 589 (1948). I see no reason why this principle should not apply to immigration crimes as well. Lower courts have so held. See, e. g., Estrada v. Rhode Island, 594 F. 3d 56, 65 (CA1 2010) (upholding the lawfulness of a detention because the officer had an objectively reasonable belief that the ar-restees “had committed immigration violations”); United States v. Vasquez-Alvarez, 176 F. 3d 1294, 1296 (CA10 1999) (noting that “state law-enforcement officers have the general authority to investigate and make arrests for violations of federal immigration laws”); Gonzales v. Peoria, 722 F. 2d 468, 475 (CA9 1983), overruled on other grounds, Hodgers-Durgin v. de la Vina, 199 F. 3d 1037 (1999) (en banc) (holding that “federal law does not preclude local enforcement of the criminal provisions” of federal immigration law). And the United States, consistent with the position long taken by the Office of Legal Counsel (OLC) in the Department of Justice, does not contend otherwise. See Brief for United States 55, n. 33; see also Memorandum from OLC to the Attorney General (Apr. 3, 2002), App. 268-273; Assistance by State and Local Police in Apprehending Illegal Aliens, 20 Op. Off. Legal Counsel 26 (1996).
More importantly, no federal statute casts doubt on this authority. To be sure, there are a handful of statutes that purport to authorize state and local officers to make immigration-related arrests in certain situations. See, e. g., *448 8 U. S. C. § 1103(a)(10) (providing for the extension of “any” immigration enforcement authority to state and local officers in the event of an “actual or imminent mass influx of aliens arriving off the coast”); § 1252e(a) (providing authority to arrest criminal aliens who had illegally reentered the country but only after consultation with the Federal Government); § 1324(c) (providing authority to make arrests for transporting and harboring certain aliens). But a grant of federal arrest authority in some cases does not manifest a clear congressional intent to displace the States’ police powers in all other cases. Without more, such an inference is too weak to overcome our presumption against pre-emption where traditional state police powers are at stake. Accordingly, in our hypothetical case, the Arizona officer may arrest the driver for violating § 1325(a) if the officer has probable cause. And if the officer has reasonable suspicion, the officer may detain the driver, to the extent permitted by the Fourth Amendment, while the question of illegal entry is investigated.
We have held that a detention based on reasonable suspicion that the detainee committed a particular crime “can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.” Illinois v. Caballes, 543 U. S. 405, 407 (2005). But if during the course of a stop an officer acquires suspicion that a detainee committed a different crime, the detention may be extended for a reasonable time to verify or dispel that suspicion. Cf. Muehler v. Mena, 544 U. S. 93, 101 (2005) (holding that “no additional Fourth Amendment justification” was required because any questioning concerning immigration status did not prolong the detention). In our hypothetical case, therefore, if the officer, after initially stopping the car for speeding, has a reasonable suspicion that the driver entered the country illegally, the officer may investigate for evidence of illegal entry. But the length and nature of this investigation must remain within the limits set out in our Fourth Amendment cases. *449 An investigative stop, if prolonged, can become an arrest and thus require probable cause. See Caballes, supra, at 407. Similarly, if a person is moved from the site of the stop, probable cause will likely be required. See Hayes v. Florida, 470 U. S. 811, 816 (1985) (holding that the line between detention and arrest is crossed “when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes”).
If properly implemented, § 2(B) should not lead to federal constitutional violations, but there is no denying that enforcement of § 2(B) will multiply the occasions on which sensitive Fourth Amendment issues will crop up. These civil-liberty concerns, I take it, are at the heart of most objections to § 2(B). Close and difficult questions will inevitably arise as to whether an officer had reasonable suspicion to believe that a person who is stopped for some other reason entered the country illegally, and there is a risk that citizens, lawful permanent residents, and others who are lawfully present in the country will be detained. To mitigate this risk, Arizona could issue guidance to officers detailing the circumstances that typically give rise to reasonable suspicion of unlawful presence. And in the spirit of the federal-state cooperation that the United States champions, the Federal Government could share its own guidelines. Arizona could also provide officers with a nonexclusive list containing forms of identification sufficient under § 2(B) to dispel any suspicion of unlawful presence. If Arizona accepts licenses from most States as proof of legal status, the problem of roadside detentions will be greatly mitigated.[1]

*450
Section 8

I agree that §3 is pre-empted because, like the Court, I read the opinion in Hines to require that result. Although there is some ambiguity in Hines, the Court largely spoke in the language of field pre-emption. The Court explained that where Congress “has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.” 312 U. S., at 66-67. In finding the Pennsylvania alien-registration law pre-empted, the Court observed that Congress had “provided a standard for alien registration in a single integrated and all-embracing system” and that its intent was “to protect the personal liberties of law-abiding aliens through one uniform national registration system.” Id., at 74. If we credit our holding in Hines that Congress has enacted “a single integrated and all-embracing system” of alien registration and that States cannot “complement” that system or “enforce additional or auxiliary regulations,” id., at 66-67, 74, then Arizona’s attempt to impose additional, state-law penalties for violations of federal registration requirements must be invalidated.

Section 5(C)

While I agree that § 3 is pre-empted, I disagree with the Court’s decision to strike down § 5(C). I do so in large measure because the Court fails to give the same solicitude to our decision in De Canas, 424 U. S. 351, as it is willing to give our decision in Hines. In De Canas, the Court upheld against a pre-emption challenge a state law imposing fines on employers that hired aliens who were unlawfully present in the *451 United States. The Court explained that the mere fact that “aliens are the subject of a state statute does not render it a regulation of immigration.” 424 U. S., at 355. The Court emphasized instead that “States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.” Id., at 356. In light of that broad authority, the Court declared that “[o]nly a demonstration that complete ouster of state power .. . was The clear and manifest purpose of Congress’ would justify” the conclusion that “state regulation designed to protect vital state interests must give way to paramount federal legislation.” Id., at 357 (some internal quotation marks omitted); see also Bates v. Dow Agrosciences LLC, 544 U. S. 431, 449 (2005) (“In areas of traditional state regulation, [the Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention ‘clear and manifest’” (some internal quotation marks omitted)).
The Court now tells us that times have changed. Since De Canas, Congress has enacted “a comprehensive framework for combating the employment of illegal aliens,” and even though aliens who seek or obtain unauthorized work are not subject to criminal sanctions, they can suffer civil penalties. Ante, at 404 (internal quotation marks omitted). Undoubtedly, federal regulation in this area is more pervasive today. But our task remains unchanged: to determine whether the federal scheme discloses a clear and manifest congressional intent to displace state law.
The Court gives short shrift to our presumption against pre-emption. Having no express statement of congressional intent to support its analysis, the Court infers from stale legislative history and from the comprehensiveness of the federal scheme that “Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment.” Ante, at 405. Because §5(C) imposes such penalties, the Court concludes that it stands *452 as an obstacle to the method of enforcement chosen by Congress. Ante, at 406-407.
The one thing that is clear from the federal scheme is that Congress chose not to impose federal criminal penalties on aliens who seek or obtain unauthorized work. But that does not mean that Congress also chose to pre-empt state criminal penalties. The inference is plausible, but far from necessary. As we have said before, the “decision not to adopt a regulation” is not “the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation.” Sprietsma v. Mercury Marine, 537 U. S. 51, 65 (2002). With any statutory scheme, Congress chooses to do some things and not others. If that alone were enough to demonstrate pre-emptive intent, there would be little left over for the States to regulate, especially now that federal authority reaches so far and wide. States would occupy tiny islands in a sea of federal power. This explains why state laws implicating traditional state powers are not pre-empted unless there is a “clear and manifest” congressional intention to do so.
Not only is there little evidence that Congress intended to pre-empt state laws like § 5(C), there is some evidence that Congress intended the opposite result. In making it unlawful for employers to hire unauthorized aliens, see 8 U. S. C. § 1324a(a), Congress made it clear that “any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws)” upon employers was pre-empted, § 1324a(h)(2). Noticeably absent is any similar directive pre-empting state or local laws targeting aliens who seek or obtain unauthorized employment. Given that Congress expressly pre-empted certain state and local laws pertaining to employers but remained silent about laws pertaining to employees, one could infer that Congress intended to preserve state and local authority to regulate the employee side of the equation. At the very least, it raises serious *453 doubts about whether Congress intended to pre-empt such authority.
The Court dismisses any inferences that might be drawn from the express pre-emption provision. See ante, at 406. But even though the existence of that provision “does not bar the ordinary working of conflict pre-emption principles” or impose a “ ‘special burden’ ” against pre-emption, Geier v. American Honda Motor Co., 529 U. S. 861, 869-870 (2000), it is still probative of congressional intent. And it is the intent of Congress that is the “ultimate touchstone.” Retail Clerks v. Schermerhorn, 375 U. S. 96, 103 (1963).
The Court infers from Congress’ decision not to impose federal criminal penalties that Congress intended to preempt state criminal penalties. But given that the express pre-emption provision covers only state and local laws regulating employers, one could just as well infer that Congress did not intend to pre-empt state or local laws aimed at alien employees who unlawfully seek or obtain work. Surely Congress’ decision not to extend its express pre-emption provision to state or local laws like § 5(C) is more probative of its intent on the subject of pre-emption than its decision not to impose federal criminal penalties for unauthorized work. In any event, the point I wish to emphasize is that inferences can be drawn either way. There are no necessary inferences that point decisively for or against pre-emption. Therefore, if we take seriously that state employment regulation is a traditional state concern and can be pre-empted only on a showing of “clear and manifest” congressional intent as required by De Canas, then § 5(C) must survive. “Our precedents establish that a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act.” Chamber of Commerce of United States of America v. Whiting, 563 U. S. 582, 607 (2011) (plurality opinion) (internal quotation marks omitted). I do not believe the United States has surmounted that barrier here.

*454
Section 6

I also disagree with the Court’s decision that §6 is preempted. This provision adds little to the authority that Arizona officers already possess, and whatever additional authority it confers is consistent with federal law. Section 6 amended an Arizona statute that authorizes warrantless arrests. See Ariz. Rev. Stat. Ann. §13-3883 (West 2010). Before § 6 was added, that statute already permitted arrests without a warrant for felonies, misdemeanors committed in the arresting officer’s presence, petty offenses, and certain traffic-related criminal violations. See §§ 13-3883(A)(l)-(4). Largely duplicating the authority already conferred by these prior subsections, §6 added a new subsection, §13-3883(A)(5) (West Supp. 2011), that authorizes officers to make warrantless arrests on probable cause that the arrestee has committed a “public offense” for which the arrestee is removable from the United States. A “public offense” is defined as conduct that is punishable by imprisonment or a fine according to the law of the State where the conduct occurred and that would be punishable under Arizona law had the conduct occurred in Arizona. See § 13-105(27).
In what way, if any, does § 6 enlarge the arrest authority of Arizona officers? It has been suggested that §6 confers new authority in the following three circumstances: (1) where the arrestee committed but has not been charged with committing an offense in another State; (2) where the officer has probable cause to believe the arrestee committed an offense for which he was previously arrested but not prosecuted; and (3) where the arrestee committed but has already served the sentence for a removable offense. 641 F. 3d 339, 361 (CA9 2011). These are exceedingly narrow categories, involving circumstances that will rarely arise. But such cases are possible, and therefore we must decide whether there are circumstances under which federal law precludes a state officer from making an arrest based on prohable cause that the arrestee committed a removable offense.
*455 A
The idea that state and local officers may carry out arrests in the service of federal law is not unprecedented. As previously noted, our cases establish that state and local officers may make warrantless arrests for violations of federal law and that in the “absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity.” Di Re, 332 U. S., at 589; see also Miller, 357 U. S., at 305 (stating that, where a state officer makes an arrest based on federal law, “the lawfulness of the arrest without warrant is to be determined by reference to state law”). Therefore, given the premise, which I understand both the United States and the Court to accept, that state and local officers do have inherent authority to make arrests in aid of federal law, we must ask whether Congress has done anything to curtail or pre-empt that authority in this particular case.
Neither the United States nor the Court goes so far as to say that state and local officers have no power to arrest criminal aliens based on their removability. To do so would fly in the face of 8 U. S. C. § 1357(g)(10). Under §§ 1357(g)(l)-(9), the Federal Government may enter into formal agreements with States and municipalities under which their officers may perform certain duties of a federal immigration officer. But §1357(g)(10)(B) makes clear that States and municipalities need not enter into those agreements “otherwise to cooperate ... in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.” It goes without saying that state and local officers could not provide meaningful cooperation in the apprehension, detention, and ultimate removal of criminal aliens without some power to make arrests.
Although §1357(g)(10) contemplates state and local authority to apprehend criminal aliens for the purpose of removal, the Court rejects out of hand any possibility that officers could exercise that authority without federal direction. *456 Despite acknowledging that there is “ambiguity as to what constitutes cooperation,” the Court says that “no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government.” Ante, at 410. The Court adopts an unnecessarily stunted view of cooperation. No one would say that a state or local officer has failed to cooperate by making an on-the-spot arrest to enforce federal law. Unsolicited aid is not necessarily uncooperative.
To be sure, were an officer to persist in making an arrest that the officer knows is unwanted, such conduct would not count as cooperation. But nothing in the relevant federal statutes suggests that Congress does not want aliens who have committed removable offenses to be arrested.[2] To the contrary, § 1226(c)(1) commands that the Executive “shall take into custody any alien” who is deportable for having committed a specified offense. And § 1226(c)(2) substantially limits the circumstances under which the Executive has discretion to release aliens held in custody under paragraph (1). So if an officer arrests an alien who is removable for having committed one of the crimes listed in § 1226(c)(1), the Federal Government is obligated to take the alien into custody.
That Congress generally requires the Executive to take custody of criminal aliens casts considerable doubt on the Court’s concern that § 6 is an obstacle to the Federal Government’s exercise of discretion. The Court claims that the authority conferred by §6 “could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case” and that this “would allow the State to achieve its own immigration policy,” resulting in the “unnecessary harassment of some aliens .. . who federal officials determine should not be removed.” Ante, at 408. But § 1226(c)(1) belies the Court’s fear. In many, if not most, *457 cases involving aliens who are removable for having committed criminal offenses, Congress has left the Executive no discretion but to take the alien into custody. State and local officers do not frustrate the removal process by arresting criminal aliens. The Executive retains complete discretion over whether those aliens are ultimately removed. And once the Federal Government makes a determination that a particular criminal alien will not be removed, then Arizona officers are presumably no longer authorized under § 6 to arrest the alien.
To be sure, not all offenses for which officers have authority to arrest under § 6 are covered by § 1226(c)(1). As for aliens who have committed those offenses, Congress has given the Executive discretion under § 1226(a) over whether to arrest and detain them pending a decision on removal. But the mere fact that the Executive has enforcement discretion cannot mean that the exercise of state police powers in support of federal law is automatically pre-empted. If that were true, then state and local officers could never make arrests to enforce any federal statute because the Executive always has at least some general discretion over the enforcement of federal law as a practical matter. But even assuming that the express statutory grant of discretion in § 1226(a) somehow indicates a congressional desire to pre-empt unilateral state and local authority to arrest criminal aliens covered by that provision, § 6 is not pre-empted on its face given its substantial overlap with § 1226(c)(1).
It bears emphasizing that §6 does not mandate the warrantless apprehension of all aliens who have committed crimes for which they are removable. Instead, it only grants state and local officers permission to make such arrests. The trouble with this premature, facial challenge is that it affords Arizona no opportunity to implement its law in a way that would avoid any potential conflicts with federal law. For example, Arizona could promulgate guidelines or regulations limiting the arrest authority conferred by § 6 to *458 the crimes specified in § 1226(c)(1). And to the extent § 1226(c)(1) is unclear about which exact crimes are covered,[3] Arizona could go even further and identify specific crimes for which there is no doubt an alien would be removable. The point is that there are plenty of permissible applications of § 6, and the Court should not invalidate the statute at this point without at least some indication that Arizona has implemented it in a manner at odds with Congress' clear and manifest intent. We have said that a facial challenge to a statute is “the most difficult challenge to mount successfully” because “the challenger must establish that no set of circumstances exists under which the [statute] would be valid.” United States v. Salerno, 481 U. S. 739, 745 (1987); see also Anderson v. Edwards, 514 U. S. 143, 155, n. 6 (1995) (applying the Salerno standard in a pre-emption case). As to § 6, I do not believe the United States has carried that heavy burden.
B
Finally, the Court tells us that §6 conflicts with federal law because it provides state and local officers with “even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers.” Ante, at 408. The Court points to 8 U. S. C. § 1357(a)(2), which empowers “authorized” officers and employees of ICE to make arrests without a federal warrant if “the alien so arrested is in the United States in violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest.” Because §6 would allow Arizona officers to make arrests “regardless of whether a federal warrant has issued or the alien is likely to escape,” ante, at 408, the Court concludes that § 6 is an obstacle to the accomplishment of Congress’ objectives. *459 But § 6 is an obstacle only to the extent it conflicts with Congress’ clear and manifest intent to preclude state and local officers from making arrests except where a federal warrant has issued or the arrestee is likely to escape. By granting warrantless arrest authority tó federal officers, Congress has not manifested an unmistakable intent to strip state and local officers of their warrantless arrest authority under state law.
Likewise, limitations on federal arrest authority do not mean that the arrest authority of state and local officers must be similarly limited. Our opinion in Miller, 357 U. S. 301, is. instructive. In that case, a District of Columbia officer, accompanied by a federal officer, made an arrest based on a suspected federal narcotics offense. Id., at 303-304. The federal officer did not have statutory authorization to arrest without a warrant, but the local officer did. Id., at 305. We held that District of Columbia law dictated the lawfulness of the arrest. Id., at 305-306. Where a state or local officer makes a warrantless arrest to enforce federal law, we said that “the lawfulness of the arrest without warrant is to be determined by reference to state law.” Id., at 305. Under §6, an Arizona officer may be authorized to make an arrest that a federal officer may not be authorized to make under § 1357(a)(2). As Miller makes clear, that fact alone does not render arrests by state or local officers pursuant to §6 unlawful. Nor does it manifest a clear congressional intent to displace the exercise of state police powers that are brought to bear in aid of federal law.

 When the REAL ID Act of 2005 takes effect, the Federal Government will no longer accept state forms of identification that fail to meet certain federal requirements. § 202(a)(1), 119 Stat. 312. One requirement is that any identification be issued only on proof that the applicant is lawfully *450 present in the United States. § 202(c)(2)(B), id., at 313. I anticipate that most, if not all, States will eventually issue forms of identification that suffice to establish lawful presence under § 2(B).

 That goes for the Executive Branch as well, which has made the apprehension and removal of criminal aliens a priority. See App. 108.

 I readily admit that it can be difficult to determine whether a particular conviction will necessarily make an alien removable. See Padilla v. Kentucky, 559 U. S. 356, 377-378 (2010) (Alito, J., concurring in judgment).